13-2762-cr
United States v. George

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2014

(Argued: November 17, 2014     Decided: February 25, 2015)

Docket No. 13-2762-cr

_____

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

ANNIE GEORGE, AKA Annie Kolath, AKA Sajimol George,

*Defendant-Appellant*.

_____

Before:

KEARSE, STRAUB, and RAGGI, *Circuit Judges.*

_____

On appeal from a conviction for harboring an illegal alien, see 8 U.S.C.

§ 1324(a)(1)(A)(iii), and related order of forfeiture, see 18 U.S.C.

§ 982(a)(6)(A)(ii)(II), defendant challenges (1) the district court's jury instruction

on the meaning of "harboring" in light of United States v. Vargas-Cordon, 733

1

F.3d 366 (2d Cir. 2013); (2) the sufficiency of the evidence to prove harboring; and

(3) the forfeiture of her residence in light of the Eighth Amendment prohibition

on excessive fines.

AFFIRMED.

————————

MARK M. BAKER (Joshua Kirshner, *on the brief*), Brafman & Associates, P.C., New York, New York, *for Defendant-Appellant*.

WILLIAM A. GLASER, Appellate Section, Criminal Division, United States Department of Justice, Washington, D.C. (David A. O'Neil, Acting Assistant Attorney General; David M. Bitkower, Deputy Assistant Attorney General; Brenda K. Sannes, Chief, Appellate Division, United States Attorney's Office for the Northern District of New York, *on the brief*), *for* Richard S. Hartunian, United States Attorney for the Northern District of New York, Syracuse, New York, *for Appellee*.

————————

REENA RAGGI, *Circuit Judge*:

Defendant Annie George appeals from a judgment of conviction and order

of forfeiture entered on July 10, 2013, in the United States District Court for the

Northern District of New York (Gary L. Sharpe, *Chief Judge*), after a jury trial at

which she was found guilty of one count of harboring an illegal alien. See 8

U.S.C. § 1324(a)(1)(A)(iii). George contends that the district court plainly erred in

instructing the jury as to the meaning of the word "harbors" in light of United

2

States v. Vargas-Cordon, 733 F.3d 366 (2d Cir. 2013), a case decided after George's conviction. She further challenges the sufficiency of the evidence to prove harboring. Finally, she argues that forfeiture of her residence pursuant to 18 U.S.C. § 982(a)(6)(A)(ii)(II) violates the Eighth Amendment's prohibition on excessive fines. We conclude that none of these arguments has merit and, therefore, affirm the judgment of conviction and order of forfeiture.

## I.    Background

### A.    The Crime of Conviction

The crime of conviction originated in defendant Annie George's employment of undocumented Indian national Valsamma Mathai as a domestic worker beginning in October 2005. Mathai had come to the United States approximately seven years earlier on a G5 visa that allowed her to reside in New York City and work for a designated employee of the United Nations. Mathai's visa did not allow her to work or live elsewhere in the United States.

Nevertheless, in 2005, Mathai left her authorized employment at the behest of a man who introduced her to Annie George and her husband.[1]

At trial, the prosecution and defense offered contradictory accounts of the ensuing relationship between the Georges and Mathai. Viewing the evidence, as we must, in the light most favorable to the government, see Jackson v. Virginia, 443 U.S. 307, 319 (1979), it appears that the Georges—who communicated with Mathai in her native language, Malayalam—offered her live-in domestic employment at a salary of $1,000 per month. Annie George knew that aliens needed United States authorization to work or live in this country. Nevertheless, she hired Mathai without ever asking to see such authorization or having Mathai fill out any employment authorization forms. By accepting the Georges' employment offer and relocating to their home, Mathai lost her lawful status in this country and became an illegal alien.

Mathai worked for George from 2005 to 2011, caring for five minor children and performing various domestic tasks throughout workdays that generally began at 5:30 a.m. and ended around 11:00 or 11:30 p.m. She worked

---

[1] George's husband (as well as the couple's eldest son) died in a plane crash in 2009, well before federal authorities learned of the activities giving rise to this case.

4

seven days a week, with no time off, vacation, or sick days. During her 66-month employment, Mathai was never paid the promised $1,000-per-month wage; rather, she received a total of approximately $25,000 to $26,000, some of which was sent directly to India to help support her sons.

Neither George nor her husband ever filed the required W-2, W-3, W-4, or 1099 forms with the Internal Revenue Service to document Mathai's employment. On one occasion when Mathai expressed concern about her lack of immigration papers, George took Mathai to see a man who might assist her in securing such papers for a fee of $4,000, which Mathai asked George to deduct from her salary. No such papers were ever obtained, and when Mathai raised the matter again, George said that she had more pressing concerns as a result of her husband's death.

Meanwhile, George instructed Mathai not to discuss her immigration status with others and to tell anyone who inquired about her presence in the George home that she was a visiting family friend. George also discouraged Mathai from traveling to India to attend her son's wedding, telling her that such travel could lead to her arrest and deportation by United States authorities.

Over time, Mathai's son became increasingly concerned about his mother's situation in the George household and, in April 2011, contacted a human trafficking hotline, an action that led to federal agents removing Mathai from the George home in May 2011. When the agents arrived at George's home for this purpose, George delayed Mathai's departure for almost two hours, refusing to speak to the agents and at one point taking Mathai into the basement before later pushing her out a side door and refusing to allow her re-entry to retrieve her possessions.

Thereafter, George had several telephone conversations with Mathai's son, which the latter recorded on his own initiative, subsequently providing the recordings to federal authorities. In one such call, George effectively acknowledged her awareness of both Mathai's illegal status in the United States and her own violation of law in employing such a person. She expressed particular concern that if Mathai told federal authorities "anything about working," George could be charged with "a big crime," because "[t]hey'll start adding up all the taxes and everything for all this time"; meanwhile, Mathai herself would be put "in jail for ten years. Poor thing. Life will be over in jail." J.A. 438. George admitted counseling Mathai to lie to authorities about her

6

presence in the George household, representing herself as a family friend rather than an employee:

> If Valsamma says she has made any money here, then they will come to me for it. That's what they are after. I have specifically told her what to say to them. I have told her to say that she was staying here because she was like family and the only reason she was staying here with us is because she knew us and not to say anything else because it will end up being a problem for all of us later . . . .

Id. at 431. George lamented that Mathai had failed to follow earlier instructions to the same effect, having "talk[ed] about not having paperwork to everyone[,] even to people that she doesn't know well." Id. at 428.

B.    Procedural History

On July 25, 2012, a grand jury in the Northern District of New York returned a one-count indictment charging George with harboring an illegal alien with the aggravating purpose of private financial gain in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and (a)(1)(B)(i). After a five-day trial, a jury found George guilty of harboring but acquitted her of the private-gain penalty enhancement. Thereafter, George moved for a judgment of acquittal on the harboring charge notwithstanding the verdict, arguing, inter alia, that the government had failed to present legally sufficient evidence to sustain conviction. See Fed. R. Crim. P.

7

29(c). The district court denied the motion in a memorandum decision dated June 27, 2013, and in a judgment filed on July 10, 2013, sentenced George to five years' probation with eight months' home confinement, and further ordered forfeiture of her Rexford, New York residence pursuant to 18 U.S.C. § 982(a)(6)(A)(ii)(II).

This timely appeal followed.

## II.   Discussion

### A.   The Challenged Jury Instruction

George argues that the district court erred in failing clearly to instruct the jury that the charged harboring crime requires evidence of concealment, i.e., conduct intended "to prevent detection by the authorities of the alien's unlawful presence" in the United States. United States v. Vargas-Cordon, 733 F.3d at 382. Because George did not object to the jury charge in the district court, we review the challenged instruction only for plain error, see Fed. R. Crim. P. 30(d), 52(b); United States v. Nouri, 711 F.3d 129, 138 (2d Cir. 2013), a standard that requires George to demonstrate (1) error, (2) that is clear or obvious, (3) affecting substantial rights, and (4) calling into question the fairness, integrity, or public reputation of judicial proceedings, see United States v. Marcus, 560 U.S. 258, 262

8

(2010).[2] George fails to carry this burden because the jury instruction, when viewed as a whole, adequately conveys the requisite concealment aspect of harboring.

A jury instruction is erroneous if it either fails adequately to inform the jury of the law or misleads the jury as to the correct legal standard. See, e.g., United States v. Sabhnani, 599 F.3d 215, 237 (2d Cir. 2010). In making such an assessment, we do not review a challenged instruction in isolation. Rather, we consider it in context "to determine whether considered as a whole, the instructions adequately communicated the essential ideas to the jury." Id. (internal quotation marks omitted); see Cupp v. Naughten, 414 U.S. 141, 146–47 (1973) (applying "well established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the

_____

[2] In her opening brief on appeal, George urged "modified" plain error review under United States v. Viola, 35 F.3d 37 (2d Cir. 1994), abrogated on other grounds by Salinas v. United States, 522 U.S. 52 (1997). In her reply brief, however, George explicitly abandons this argument. See Appellant's Reply Br. 14 n.2. We, therefore, need not address whether the modified plain error standard remains viable in light of Johnson v. United States, 520 U.S. 461 (1997). See United States v. Botti, 711 F.3d 299, 308–10 (2d Cir. 2013) (discussing uncertain validity of modified plain error review).

overall charge"); accord United States v. Tran, 519 F.3d 98, 105 (2d Cir. 2008);

United States v. Mitchell, 328 F.3d 77, 82 (2d Cir. 2003).

> The statute here at issue criminally punishes any person who,

> knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation.

8 U.S.C. § 1324(a)(1)(A)(iii). Prior to United States v. Vargas-Cordon, 733 F.3d 366, our precedent had lacked consistency in construing the "harbor[ing]" proscribed by this section. Some cases had interpreted harboring to imply an element of evasion or concealment to prevent authorities from detecting the alien's unlawful presence; other cases had construed harboring to encompass conduct that, with or without evasion, tended substantially to facilitate an alien's remaining in the United States illegally. See id. at 380 (collecting cases). In Vargas-Cordon, we recognized that common usage and dictionary definitions supported both constructions, but upon careful review of the text and structure of the statute, we determined that all three of the proscribed actions—"conceals, harbors, or shields from detection"—"shar[e] a common core of meaning centered around evading detection." Id. at 381 (internal quotation marks

10

omitted).  Thus, as <u>Vargas-Cordon</u> now makes clear, to constitute harboring, a defendant's action must be intended (1) substantially to facilitate an illegal alien's remaining in the United States, and (2) to prevent the alien's detection by immigration authorities:

> To 'harbor' under § 1324, a defendant must engage in conduct that is intended both to substantially help an unlawfully present alien remain in the United States—such as by providing him with shelter, money, or other material comfort—and also is intended to help prevent the detection of the alien by the authorities.  The mere act of providing shelter to an alien, when done without intention to help prevent the alien's detection by immigration authorities or police, is thus not an offense under § 1324(a)(1)(A)(iii).

<u>Id.</u> at 382.

Although the district court did not have the benefit of <u>Vargas-Cordon</u> when it charged the jury in this case, George is entitled to rely on that decision in urging plain error on appeal.  <u>See</u> <u>Henderson v. United States</u>, 133 S. Ct. 1121, 1130–31 (2013) (stating that whether "legal question was settled or unsettled at the time of trial, it is enough that an error be 'plain' at the time of appellate consideration" (internal quotation marks omitted)).  Citing <u>Vargas-Cordon</u>'s statement that, "if the district court had [there] instructed the jury that 'harboring'. . . 'simply means to shelter,' it would have erred," 733 F.3d at 382,

George argues that the district court did just that in her case when it told the jury that "[h]arboring means simply to afford shelter to," and that there was no need for it to find "that Ms. George acted secretly or that the harboring of the alien was clandestine," J.A. 805.

These challenged statements must, of course, be read in context. See United States v. Sabhnani, 599 F.3d at 237. In doing so here, we conclude that the district court adequately conveyed both the concealment and substantial facilitation aspects of harboring identified in Vargas-Cordon, as demonstrated by the highlighted language below:

> The third element is harboring, concealing or shielding from detection. This element which the government must prove beyond a reasonable doubt is that Ms. George harbored or concealed or shielded from detection or attempted to harbor, conceal or shield from detection an alien who had come to, entered or remained in the United States in violation of the law. Harboring means simply to afford shelter to, shield from detection, to act in a way that prevents the authorities from learning of the fact that an alien is in the United States illegally. You need not find that Ms. George acted secretly or that the harboring of the alien was clandestine.

> The fo[u]rth element is substantial facilitation. The fourth element the government must prove beyond a reasonable doubt is that Ms. George's actions of harboring or concealing or shielding from detection substantially facilitated the alien's ability to remain in the United States illegally . . . to make that alien's remaining in the United States illegally substantially easier or less difficult.

12

J.A. 805 (emphasis added).

With particular reference to the concealment aspect of harboring, the highlighted language in the first paragraph shows that when the district court defined harboring as "afford[ing] shelter," it made clear that what it meant by sheltering was action that shielded the alien from detection or discovery by the authorities. In short, while the statute uses "conceals, harbors, or shields from detection" in the disjunctive, the district court here instructed the jury to view these actions as synonymous, at least to the extent that preventing an illegal alien's detection by authorities was their common underlying purpose. Thus, there is no merit to George's claim that the district court here failed to instruct the jury as to the concealment aspect of harboring.

Nor is a different conclusion compelled by the district court's statement that harboring did not require proof "that Ms. George acted secretly or that the harboring of the alien was clandestine." Id. In fact, this accurately states the law. In United States v. Kim, 193 F.3d 567, 575 (2d Cir. 1999), cited approvingly in Vargas-Cordon for its recognition of the dual facilitation and concealment aspects of harboring, see 733 F.3d at 382, this court held that a defendant who

openly employed an illegal alien under a false name and submitted falsified work authorization documents to immigration authorities was nevertheless guilty of harboring. In short, even if a defendant intent on concealing an illegal alien from detection by authorities might also generally seek to conceal his own actions in doing so, it is only the former effort at concealment, not the latter, that is necessary to establish harboring.

George's plain error claim is further undermined by the fact that in Vargas-Cordon, we upheld a harboring conviction even though the district court there too instructed the jury that "'"[h]arboring" simply means to shelter, to afford shelter to.'" 733 F.3d at 382 (quoting jury charge). In so ruling, we observed that in "the very next sentence," the district court stated that the government was obliged to prove that the defendant afforded shelter "'in a way intended to substantially facilit[ate] her remaining here illegally.'" Id. (quoting jury charge) (emphasis omitted). We concluded that by thus requiring proof of intended facilitation, the harboring instruction as a whole sufficiently informed the jury as to the requisite concealment. See id. At the same time, however, we acknowledged that it would have been preferable to make that point by

14

"explain[ing] that harboring requires acting with an intent to prevent an alien's detection." Id. at 382 n.10.

Here, the district court's instruction was substantially similar to that in Vargas-Cordon in explaining both the concealment and facilitation aspects of harboring. See J.A. 805. In urging otherwise, George contends—for the first time in her reply brief—that the district court nevertheless plainly erred in focusing the jury's attention on whether a defendant "act[ed] in a way that prevent[ed] the authorities from learning" of an illegal alien's presence in the United States, id., rather than on whether the defendant acted in a way intended to prevent such detection. We generally treat arguments raised for the first time in a reply brief as waived. See, e.g., Sherman v. Town of Chester, 752 F.3d 554, 568 n.4 (2d Cir. 2014). While that, by itself, is reason enough to reject George's belated mens rea challenge, she fails in any event to demonstrate plain error.

The law focuses on a defendant's intent to conceal and to facilitate to ensure that the prohibition against "harboring" is not cabined more narrowly than warranted. Thus, as we observed in Vargas-Cordon, a defendant who intends to conceal an illegal alien from authorities may be guilty of harboring even though his conduct "lack[s] the hallmarks of active, classic concealment."

15

733 F.3d at 382 (observing that "even if Vargas-Cordon's conduct lacked the hallmarks of active, classic concealment, it nevertheless was intended to make [the illegal alien's] detection by the authorities substantially more difficult"). But where active concealment is proved, it will be the rare case in which a defendant will not have intended the achieved result. That is not this case.

As we explain in the next section of this opinion, addressing George's sufficiency challenge, the evidence of George's intent to prevent Mathai's detection by authorities was overwhelming. Any misdescription of the 'harboring' element here was thus harmless beyond a reasonable doubt. See Neder v. United States, 527 U.S. 1, 10 (1999) (ruling that omission of element is subject to harmless error review); see, e.g., United States v. Agrawal, 726 F.3d 235, 257 (2d Cir. 2013) (holding omission of element harmless where proved by overwhelming evidence). Accordingly, while we expect that, after Vargas-Cordon, district courts will charge the concealment and facilitation aspects of harboring by reference to the defendant's intent, George cannot show that any failure to do so here affected her substantial rights. See United States v. Marcus, 560 U.S. at 262 (stating that to satisfy third prong of plain error, defendant must normally demonstrate that alleged error was not harmless). Much less can she

16

claim that any such error calls into question the fairness, integrity, or public reputation of the judicial proceedings. See Johnson v. United States, 520 U.S. 461, 469–70 (1997) (holding fourth prong of plain error not satisfied where "no 'miscarriage of justice'" occurred because evidence of omitted element was "overwhelming" (alteration omitted)).

Thus, we identify no plain error in the district court's jury instruction on the harboring element of the crime of conviction.

B.    Sufficiency of the Evidence

George asserts that she was entitled to a judgment of acquittal under Fed. R. Crim. P. 29 because the trial evidence was insufficient as a matter of law to prove that her actions were intended to prevent law enforcement authorities from detecting Mathai's illegal presence in the United States. She bears a heavy burden in making this argument because not only must we view the evidence in the light most favorable to the prosecution, drawing all reasonable inferences in its favor, but also we must affirm the conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. at 319 (emphasis in original); accord, e.g., United States v. Agrawal, 726 F.3d at 254; United States v. Robinson, 702 F.3d 22, 34–35

17

(2d Cir. 2012). Here, the trial record, when viewed in its entirety and in the light most favorable to the prosecution, overwhelmingly demonstrates that George's actions were intended to conceal Mathai's illegal presence in this country from authorities.

First, George admitted knowing both that it was illegal for an alien to work in the United States without proper authorization and that Mathai lacked such authorization. Nevertheless, George hired Mathai as a domestic worker and had her reside in the George home for more than five years. This evidence plainly demonstrated George's knowledge that she had something to hide from authorities: the presence in her home of an undocumented alien worker. The remaining evidence we reference demonstrated her intent to effect such concealment.

Second, in the more than five years that she employed Mathai as a live-in worker, George never filed any of the forms required by the Internal Revenue Service for employers to document their paid workers. She maintains that this omission is insufficient to demonstrate active concealment, citing United States v. Litwok, 678 F.3d 208, 215 (2d Cir. 2012), a case in which we stated that the failure to file a tax return is insufficient, by itself, to constitute the affirmative act of tax

evasion under 26 U.S.C. § 7201.  The analogy is inapt.  The issue here is not whether George's filing omission constitutes an affirmative act of tax evasion, or even active concealment under 8 U.S.C. § 1324(a)(1)(A)(iii), an issue we need not here decide.  Rather, the pertinent question is whether that omission is a circumstance from which a reasonable jury could infer that the action here at issue—George's sheltering of Mathai in her home for more than five years—was intended to prevent authorities from discovering the alien's illegal presence, thereby constituting proscribed harboring.  We here conclude that George's persistent failure to file employment records required by law was circumstantial evidence providing some support for an inference of intent as to George's sheltering.  See generally United States v. MacPherson, 424 F.3d 183, 189–90 (2d Cir. 2005) (recognizing that "mens rea elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom"); United States v. Salameh, 152 F.3d 88, 143 (2d Cir. 1998) (recognizing that "most evidence of intent is circumstantial").

Nor is a different conclusion warranted because George may have had a financial interest in not filing the required tax forms for Mathai.  To the contrary, such a self-interest was evidence of George's motive to prevent authorities from

19

detecting Mathai's unlawful presence in the George home. See United States v. MacPherson, 424 F.3d at 185 n.2 ("[E]vidence of motive, or the lack thereof, is a factor that a jury may weigh in considering whether the totality of the circumstances permits it to infer guilty knowledge and intent beyond a reasonable doubt." (citing United States v. Simon, 425 F.2d 796, 808 (2d Cir. 1969) (Friendly, J.))).

Third, George's intent to conceal finds still stronger support in evidence that she specifically instructed Mathai, during more than five years of employment, not to discuss her immigration status with anyone and, if asked, to represent herself falsely as a visiting family friend, not a domestic worker.

In urging otherwise, George emphasizes that she never hid Mathai from visitors nor restricted her movements or mistreated her in any way. This misses the point. George was not charged with human trafficking, imprisonment, or abuse. See 18 U.S.C. § 1581(a) (prohibiting peonage); id. § 1589 (prohibiting procurement of labor by force or threat). She was charged with harboring, proscribed conduct requiring proof only that George sheltered Mathai in her home intending to make the alien's "detection by the authorities substantially more difficult." United States v. Vargas-Cordon, 733 F.3d at 382 (emphasis

20

added). In <u>Vargas-Cordon</u>, we held that where a defendant's conduct "undoubtedly diminished the government's ability to locate" an illegal alien, he was guilty of harboring even if he "did not actively hide [the alien] from the outside world." <u>Id.</u> The same conclusion applies here. George may not have hid Mathai from the outside world, but by counseling Mathai to lie about her status to anyone who asked, George plainly diminished the likelihood of government authorities' discovering that she had an alien illegally working in her home.

<u>Fourth</u>, the inference of George's culpable <u>mens rea</u> before Mathai was discovered by authorities is reinforced by George's post-discovery actions. Her stalling efforts when authorities finally came to remove Mathai from the George home, while plainly futile, nevertheless allowed a reasonable jury to infer that her sheltering actions had long been intended to hamper the very discovery that prompted Mathai's removal. A factfinder could similarly infer consciousness of guilt from George's efforts at obstruction, both in urging Mathai to lie to law enforcement officials about her status in the George home, and in her own lying at trial, which the district court found justified a sentencing enhancement for obstruction of justice under section 3C1.1 of the Sentencing Guidelines. <u>See, e.g.,</u>

21

United States v. Perez, 387 F.3d 201, 209 (2d Cir. 2004) (recognizing flight,

obstruction, and false statements as evidence of consciousness of guilt).

In sum, the evidence, viewed as a whole and in the light most favorable to

the government, overwhelmingly demonstrated that George acted with the

requisite intent to conceal Mathai's illegal presence in the United States from

federal authorities and, thus, was sufficient to allow a reasonable jury to find

harboring proved beyond a reasonable doubt.  Accordingly, George's sufficiency

challenge fails on the merits.

C.    Forfeiture

George's harboring conviction subjected her to the mandatory forfeiture of

"any property real or personal" that was "used to facilitate . . . the commission"

of that crime.  18 U.S.C. § 982(a)(6)(A) (stating that "court, in imposing sentence

. . . shall order that the person forfeit to the United States . . . ").  Pursuant to this

section, the district court ordered the forfeiture of George's Rexford, New York

home, an action that she now challenges as violative of the Eighth Amendment's

prohibition on excessive fines.  See U.S. Const. amend. VIII; United States v.

Bajakajian, 524 U.S. 321, 328 (1998) (holding forfeiture imposed at culmination of

criminal proceeding, which requires conviction of underlying felony, to be

punishment subject to Excessive Fines Clause). We review a district court's legal determinations regarding forfeiture <u>de novo</u> and its underlying factual findings for clear error. See <u>United States v. Sabhnani</u>, 599 F.3d at 261.

A criminal forfeiture is unconstitutionally excessive if "it is grossly disproportional to the gravity of a defendant's offense." <u>United States v. Bajakajian</u>, 524 U.S. at 334. In that case, a defendant convicted of willfully failing to report the transportation of more than $10,000 out of the United States was ordered to forfeit the full amount being transported, almost $360,000. See <u>id.</u> at 324–25. In holding the forfeiture grossly disproportional, the Supreme Court observed that the crime of conviction "was solely a reporting offense"; that the defendant was not transporting the money for any illegal purpose, such as money laundering, drug trafficking, or tax evasion; that the maximum punishment under the (then-mandatory) Sentencing Guidelines was six months' imprisonment and a $5,000 fine; and that the harm resulting from the crime was "minimal," affecting only the government and only in a minor way. <u>Id.</u> at 337–39. Consistent with <u>Bajakajian</u>, this court has identified the following factors as relevant to the proportionality assessment of a challenged criminal forfeiture:

> (1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct.

United States v. Castello, 611 F.3d 116, 120 (2d Cir. 2010) (internal quotation marks and alterations omitted). Here, these factors support the challenged forfeiture.

First, the essence of George's crime was no one-time failure to report otherwise legal activity as in Bajakajian. Rather, she harbored an illegal alien in her home for more than five years in order to secure the alien's unauthorized labor. In doing so, she not only thwarted federal immigration law, but also evaded federal minimum wage and tax laws. In these circumstances, the forfeiture of the home that facilitated George's criminal harboring is not constitutionally disproportional.[3] See generally von Hofe v. United States, 492 F.3d 175, 188 (2d Cir. 2007) (upholding civil forfeiture of husband's interest in family home, where his drug activity therein was "neither a spur of the moment

---

[3] George harbored Mathai in each of the homes occupied by her family from 2005 to 2011. The Rexford, New York property that is the subject of the challenged forfeiture became the George family home sometime in August 2008 and, thus, was the site of harboring for almost three years.

24

decision nor a momentary lapse of judgment," such "that his own actions eviscerated any sanctity he might claim in his home").[4]

Second, George falls squarely within the class of persons targeted by 8 U.S.C. § 1324, namely, persons who knowingly and actively seek to prevent government detection of an illegal alien for their own benefit. In short, she is not akin to the Bajakajian defendant, whose currency reporting failure did not take place in the context of money laundering, drug trafficking, or tax evasion, the targeted concerns of that crime of conviction. See United States v. Bajakajian, 524 U.S. at 338.

Third, while the equity loss[5] to George from the challenged forfeiture of her home exceeds the $20,000 top of George's applicable Guidelines fine range,

---

[4] George's reliance on those parts of our von Hofe opinion holding complete forfeiture of the wife's interest in the family home grossly disproportional is misplaced because not only were we there considering civil forfeiture, see von Hofe v. United States, 492 F.3d at 184–86 (discussing differences between civil in rem and criminal in personam forfeiture), but also George was no comparably passive participant in the crime of conviction. Rather, she was its principal and persistent perpetrator. Thus, her role is more analogous to that of the husband in von Hofe—the forfeiture of whose interest in the family home we upheld, see id. at 188—than it is to that of the wife, see id. at 188–91.

[5] George appears to have held an equity interest in the home of less than $100,000. See generally von Hofe v. United States, 492 F.3d at 188 (relying on

25

<u>see</u> U.S.S.G. § 5E1.2(c)(3), it is well below the maximum statutory fine of $250,000 specified by Congress, <u>see</u> 8 U.S.C. § 1324(a)(1)(B)(ii); 18 U.S.C. § 3571(b)(3); <u>see, e.g.</u>, <u>United States v. Bajakajian</u>, 524 U.S. at 338–39 & n.14 (citing low maximum penalties under then-mandatory Guidelines as indicative of defendant's "minimal level of culpability," while also noting that statutory maximum penalties are "relevant" to assessing "offense's gravity").[6] This factor points to no disproportionality in the challenged forfeiture order.

---

equity interest in home held by each co-defendant to assess constitutionality of civil forfeiture of residence); <u>United States v. 38 Whalers Cove Dr.</u>, 954 F.2d 29, 32, 39 (2d Cir. 1992) (relying on equity interest in mortgaged home, rather than full market value, in assessing value of civil forfeiture). The market value of George's home, when purchased in 2009, was $1,878,500. **[Blue 56]** Although there is little evidence in the record as to the value of George's home when the district court entered judgment in July 2013, the balance owed on the mortgage was $1,781,562 in June 2013. Therefore, assuming the market value of the property remained constant, George's equity interest in her home was approximately $96,938 at the time the forfeiture order was entered. Moreover, the listed owner of the residence was "Power Angels, LLC," an entity owned by George, her five minor children, and her brother. Even assuming, however, that the full weight of the forfeiture of the equity interest were to fall solely on George, we identify no unconstitutional disproportionality for reasons explained in text.

[6] Where, as here, a defendant's harboring of an illegal alien persists over more than five years, frustrating federal immigration, minimum wage, and tax laws, it would be difficult to conclude that a $20,000 fine marks the outer limits of substantive reasonableness after the Supreme Court's decision in <u>United States v.</u>

26

Fourth, as for the harm caused by George, we have already observed that her crime was no mere failure to report otherwise legal activity as in Bajakajian, but a deliberate and sustained thwarting of federal immigration law, which allowed her to exploit alien labor while ignoring federal wage and tax laws. Such criminal conduct harmed not only the government, but also the exploited alien, as well as those citizens and lawful residents whose ability to secure work consistent with the protections of federal law was necessarily hampered by the sort of harboring evident here. In sum, this is not a case in which the harshness of the forfeiture so exceeds the gravity of the offense of conviction as to indicate gross disproportionality violative of the Constitution.

---

Booker, 543 U.S. 220 (2005). See United States v. Jones, 531 F.3d 163, 174 (2d Cir. 2008) (recognizing that, after Booker, broad range of sentences reaching beyond Guidelines' recommendation may be substantively reasonable). For much the same reason, while the Guidelines helpfully inform an assessment of the gravity of a crime of conviction, they do not compel a conclusion that any forfeiture above a Guidelines maximum is unconstitutionally excessive. That determination can be made only by reference to the totality of factors identified in Bajakajian and Castello. See generally United States v. Carpenter, 317 F.3d 618, 627 (6th Cir. 2003) (observing that authorized Guidelines penalties "are but one of several factors to consider in assessing the overall gravity of the offense" of conviction), adopted in relevant part on reh'g en banc, 360 F.3d 591, 597 (6th Cir. 2004) (en banc).

Accordingly, we reject George's Eighth Amendment challenge to the forfeiture order as meritless.

## III. Conclusion

To summarize:

1.   The district court's jury instruction on "harboring" adequately communicated the required concealment aspect of that proscribed activity and, thus, manifests no plain error.

2.   George's sufficiency challenge to her harboring conviction fails because the trial evidence, viewed in its totality and in the light most favorable to the government, permitted a reasonable jury to find that George afforded shelter to an illegal alien for more than five years intending to help prevent detection of the alien by federal authorities.

3.   The forfeiture of George's equity interest in her home, when considered in light of the gravity of her crime of conviction, does not demonstrate gross disproportionality violative of the Eighth Amendment.

Accordingly, the district court's judgment of conviction and order of forfeiture are AFFIRMED.