NOT DESIGNATED FOR PUBLICATION

No. 127,980

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

LANDLORDS OF LAWRENCE,
*Appellant*,

v.

CITY OF LAWRENCE,
*Appellee*.

MEMORANDUM OPINION

Appeal from Douglas District Court; MARK A. SIMPSON, judge. Oral argument held April 8, 2025. Opinion filed May 16, 2025. Affirmed.

*Adam M. Hall*, of Thompson-Hall, P.A., of Lawrence, for appellant.

*Michelle R. Stewart* and *Lindsey R. Freihoff*, of Hinkle Law Firm, LLC, of Lenexa, for appellee.

Before PICKERING, P.J., BRUNS and SCHROEDER, JJ.

PER CURIAM: In this action for declaratory judgment and injunctive relief, the Landlords of Lawrence—an unincorporated association—appeal from the district court's order granting summary judgment to the City of Lawrence. The district court rejected the Landlords of Lawrence's challenge to the Lawrence City Commission's 2023 amendments to Chapter 10 of the City Code on the grounds that it is unconstitutionally vague, preempted by federal law, and violates the Fourth Amendment to the United States Constitution. In granting summary judgment in favor of the City of Lawrence, the district court ruled that the amendments were not unconstitutionally vague. Likewise, the district court determined that federal law did not preempt the amendments to Chapter 10

1

of the City Code. Finally, the district court determined that the Landlords did not have standing to challenge the amendments as violative of the Fourth Amendment. For the reasons set forth in this opinion, we affirm the district court's decision.

FACTS

The parties agree that the material facts relating to the issues presented in this appeal are undisputed. Relevant to the issues raised on appeal, Chapter 10 of the City Code of Lawrence governs housing and real property practices within the city. It prohibits housing discrimination based on race, sex, religion, color, national origin, age, ancestry, and various other classes.

On February 14, 2023, the Lawrence City Commission amended Chapter 10 of the City Code by enacting Ordinance 9960. This amendment—which became effective on June 1, 2023—added provisions prohibiting landlords from considering a person's "source of income" or "immigration status" in making rental decisions. To accomplish this objective, several sections of Chapter 10 were amended, and several new sections were added. We will discuss these specific provisions of Ordinance 9960 as necessary in the analysis section of our opinion.

On April 24, 2023, the Landlords of Lawrence filed a petition for injunctive and declaratory relief. In the petition, the Landlords of Lawrence claimed that the amendments to Chapter 10 of the City Code have "the effect of requiring all landlords in Lawrence to involuntarily participate in all housing subsidy programs . . . by mandating that all landlords give equal consideration to rental applications of voucher-holding prospective tenants, even if . . . the administrative burdens of program participation are too great." In addition, the Landlords of Lawrence claimed that "the inclusion of 'immigration status' as a protected class subjects Lawrence landlords . . . to federal

2

criminal liability, because 8 U.S.C. [§] 1324(a)(1)(A)(iii) makes it a felony to harbor an 'alien' who remains in the United States in violation of law."

In the petition, the Landlords of Lawrence sought a declaratory judgment finding that the "source of income" provisions of the amendments to Chapter 10 of the City Code are invalid because they violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution and are preempted by federal housing laws. Similarly, the Landlords of Lawrence sought a declaratory judgment finding that the "immigration status" provisions are invalid because they are preempted by federal law. In addition, the Landlords of Lawrence sought a permanent injunction to prevent the enforcement of the amendments to the City Code.

In a first amended petition, the Landlords of Lawrence attached a written declaration of one of its members in an attempt to establish standing to challenge the amendments to Chapter 10 of the City Code. In a second amended petition, the Landlords of Lawrence added a claim that the "source of income" provisions violate the Fourth Amendment right to be free from unreasonable searches and seizures. Subsequently, both parties filed motions for summary judgment in which they agreed that this case presents only questions of law.

On May 7, 2024, the district court entered a 23-page memorandum decision and journal entry granting the City's motion and denying the Landlords of Lawrence's motion. In granting the City summary judgment as a matter of law, the district court determined that the "source of income" definition in the amendments is not unconstitutionally vague. Although the district court recognized that the amendments were broad, it found that they provide "adequate notice of what a landlord must do to avoid enforcement actions." The district court also concluded that the "source of income" provisions are not preempted by federal law.

Regarding the "immigration" provisions, the district court found that they are also not preempted by federal law. The district court also determined that the Landlords of Lawrence lacked standing to challenge the amendments to Chapter 10 of the City Code as violative of the Fourth Amendment. The district court explained that the Landlords of Lawrence has not shown an "imminent threat" of harm and the record is "silent about what type of search is at issue or the parameters and procedure for that search." Ultimately, the district court denied both the Landlords of Lawrence's request for a declaratory judgment and its request for a permanent injunction.

ANALYSIS

*Issues Presented*

On appeal, the Landlords of Lawrence present multiple issues. We will first address its contention that the amendments to Chapter 10 of the City Code are invalid under the doctrine of federal preemption. Next, we will address its contention that the challenged provisions are unconstitutionally vague. Finally, we will address its contention that the district court erred in determining that it lacked standing to challenge the amendments as a violation of the Fourth Amendment.

*Standard of Review*

Because this appeal comes to us from the district court's decision granting summary judgment to the City, our review is unlimited. *American Warrior, Inc. v. Board of Finney County Comm'rs*, 319 Kan. 78, 82, 552 P.3d 1219 (2024). Summary judgment is appropriate when there are no genuine questions of material fact, and the movant is entitled to judgment as a matter of law. *First Security Bank v. Buehne*, 314 Kan. 507, 510, 501 P.3d 362 (2021). Here, although the parties dispute how the amendments to Chapter 10 of the City Code may ultimately be enforced by the City, they agree that there are no disputed questions of material fact related to the issues presented in this appeal.

4

*Federal Preemption Doctrine*

Under the Supremacy Clause, the United States Constitution and federal laws are deemed to be "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2; see *Kansas v. Garcia*, 589 U.S. 191, 202, 140 S. Ct. 791, 206 L. Ed. 2d 146 (2020). The federal preemption doctrine gives force to the Supremacy Clause and invalidates state laws—as well as municipal ordinances—that conflict with or are contrary to federal law. See *Wichita Terminal Association v. F.Y.G. Investments, Inc.*, 48 Kan. App. 2d 1071, Syl. ¶ 1, 305 P.3d 13 (2013). "Simply put, the Supremacy Clause invalidates state laws [and municipal ordinances] that interfere with, or are contrary to, federal law." *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 294, 255 P.3d 1186 (2011).

Federal preemption is a question of law based on the provisions of the United States Constitution and congressional intent. *Wichita Terminal Association*, 48 Kan. App. 2d at 1078-79. It arises under only three circumstances:  (1) express preemption:  where Congress has expressly stated its intention to preempt state law; (2) preemption by occupation of the field:  where there is evidence of Congress' intent to exclusively occupy a given field; and (3) preemption by direct conflict:  where there is a direct conflict between the federal and state law or city ordinance to the extent that compliance with both federal and state law is an impossibility. See *Arizona v. United States*, 567 U.S. 387, 399, 132 S. Ct. 2492, 183 L. Ed. 2d 351 (2012).

In analyzing issues of preemption, we start from the premise "that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S. Ct. 2114, 68 L. Ed. 2d 576 (1981) (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 [1947]); see also *Moore v. City of Lawrence*, 232 Kan. 353, Syl. ¶ 4, 654 P.2d 445 (1982) ("A city ordinance should be permitted to stand

unless an actual conflict exists between the ordinance and a statute, or unless the legislature has clearly preempted the field so as to preclude municipal action."). In other words, federal preemption cannot be based on a "'freewheeling judicial inquiry into whether a state statute [or municipal ordinance] is in tension with federal objectives.'" *Chamber of Commerce of the United States v. Whiting*, 563 U.S. 582, 607, 131 S. Ct. 1968, 179 L. Ed. 2d 1031 (2011).

*"Immigration Status" Provisions*

The members of the Landlords of Lawrence contend that the district court erred in determining that the amendments to Chapter 10 of the City Code regarding "immigration status" are subject to federal preemption. In particular, they assert these amendments conflict with 8 U.S.C. § 1324(a)(1)(A)(iii), which makes it a federal crime to "conceal[], harbor[], or shield[] from detection" a person—or attempt to do so—who has "entered[] or remains in the United States in violation of law . . . ." In response, the City argues that neither Congress nor the federal courts have defined the term "harbor" to include landlords who simply rent to someone who entered or remains in this country unlawfully.

Article 1, Section 8, Clause 4 of the United States Constitution grants Congress the power to establish a "uniform Rule of Naturalization." The United States Supreme Court has interpreted this constitutional provision to mean that "[t]he government of the United States has broad, undoubted power over the subject of immigration . . . ." *Arizona*, 567 U.S. at 394. Even so, the extent to which states or local governments may enact laws or ordinances that potentially impact "the subject of immigration" is currently being litigated in federal courts. See, e.g., *United States v. Texas*, No. 1:24-CV-00008 (W.D. Tex. 2024). Although perhaps the United States Supreme Court will one day speak on the issue of whether states and local governments have been completely ousted from the field of promulgating laws or ordinances that touch on the "subject of immigration," it remains an open question at this point in time.

The United States Court of Appeals for the Fifth Circuit has found that field preemption requires "complete ouster of state power including state power to promulgate laws not in conflict with federal laws was 'the clear and manifest purpose of Congress.'" *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018); see also *Keller v. City of Fremont*, 719 F.3d 931, 943 (8th Cir. 2013) (rejecting claim of field preemption for anti-harboring ordinance because there was no showing that Congress intended to preempt state law or local governments from imposing penalties for the violation of prohibited "harboring"). On the other hand, in *Lozano v. City of Hazelton*, 724 F.3d 297 (3d Cir. 2013), the Third Circuit determined that city ordinances seeking to regulate the employment of those unlawfully in the United States and prohibiting those who are in this country unlawfully from residing in rental housing are preempted by federal law. 724 F.3d at 317.

The present case—unlike *Lozano*—involves a city ordinance that merely prohibits landlords from discriminating against prospective tenants on the basis of their immigration status. It does not explicitly require landlords to rent to those who are in this country unlawfully nor does it prevent them from refusing to rent to a potential tenant based on other legitimate grounds. Consequently, we do not find the "immigration status" provisions to be preempted under field preemption.

The Landlords of Lawrence also asserts conflict preemption based on 8 U.S.C. § 1324(a)(1)(A)(iii). As discussed above, state laws or city ordinances "are preempted when they conflict with federal law" and when compliance with both federal and local regulations is an impossibility. *Arizona*, 567 U.S. at 399. This is why conflict preemption is sometimes referred to as impossibility preemption—because it applies when compliance with both federal and local laws is impossible. *Cerveny v. Aventis, Inc.*, 855 F.3d 1091, 1098 (10th Cir. 2017).

We find it to be significant that 8 U.S.C. § 1324(a)(1)(A)(iii) requires proof of either knowledge or recklessness in order to be guilty of harboring a person who entered or remains in the United States unlawfully. As the district court pointed out, other federal courts have rejected the argument that a landlord could be convicted of harboring based solely on providing housing to a person unlawfully present within the United States. For example, in *United States v. Lopez*, 521 F.2d 437, 439 (2d Cir. 1975)—in which the defendant provided housing to 27 people who were unlawfully in the United States—the Second Circuit explained:

> "In addition to providing lodging to large numbers of aliens with knowledge of their illegal entry, appellant had assisted many of them in other ways designed to facilitate their continued unlawful presence in the United States. He had helped some to obtain employment by personally filling out job applications on their behalf and by transporting them in vans to and from work. In return for payment to him of substantial sums of money by others Lopez, as a means of enabling them to assume the guise of an apparently lawful status in the United States, had arranged sham marriages, i.e., ceremonies for marriages that were not consummated, with the participants parting immediately after the ceremony." 521 F.2d at 439.

More recently, the Second Circuit clarified that "[t]o 'harbor' under § 1324, a defendant must engage in conduct that is intended both to substantially help an unlawfully present alien remain in the United States . . . and also is intended to help prevent the detection of the alien by the authorities." *United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2d Cir. 2013). In other words, "where a defendant's conduct 'undoubtedly diminished the government's ability to locate' an illegal alien, he was guilty of harboring even if he 'did not actively hide [the person] from the outside world.'" *United States v. George*, 779 F.3d 113, 121 (2d Cir. 2015).

Similarly, in *Reyes v. Waples Mobile Home Park*, 91 F.4th 270, 279 (4th Cir. 2024), the Fourth Circuit Court of Appeals found that the federal statute does not put a

8

landlord at risk "simply for leasing to families with undocumented immigrants." In reaching this conclusion, the Fourth Circuit found:

> "The text of the anti-harboring statute requires something more than merely entering a lease agreement with an undocumented immigrant. To violate the statute, one must 'knowing[ly]' or 'reckless[ly]' 'conceal, harbor, or shield from detection' such a person. 8 U.S.C.A. § 1324(a)(1)(A)(iii). Conceal, harbor, and shield are all active verbs. Thus, the statute only applies to those who intend in some way to aid an undocumented immigrant in hiding from the authorities. It involves an element of deceit that is not present in run-of-the mill leases made in the ordinary course of business." 91 F.4th at 277.

Based on these cases, it is apparent that in order to be found guilty of harboring under the federal law, a landlord must do more than simply rent property to a person who is in the country unlawfully. In addition, a landlord must take some action to diminish or interfere with the government's ability to locate those who entered or remain in the United States unlawfully. Although perhaps Congress or the United States Supreme Court could interpret the term "harbor" as used in 8 U.S.C. § 1324(a)(1)(A)(iii) in a way which conflicts with the "immigration status" amendments to Chapter 10 of the City Code that are at issue here, we do not find the requirements of the ordinance to conflict with current federal law nor do we find compliance with both to be impossible.

The Landlords of Lawrence further asserts that the "immigration status" provisions added to Chapter 10 of the City Code are preempted because they present obstacles to the objectives of federal housing law. See *Bluestem Telephone Co. v. Kansas Corporation Comm'n*, 52 Kan. App. 2d 96, 109, 363 P.3d 1115 (2015). A state law or local ordinance is preempted if it "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *California v. ARC America Corp.*, 490 U.S. 93, 100-01, 109 S. Ct. 1661, 104 L. Ed. 2d 86 (1989). The City responds that the

9

amendments—on their face—do not present an obstacle to the objectives of the federal government.

In support of its argument, the Landlords of Lawrence invite us to take judicial notice of a report entitled "Final Report and Recommendations of the Select Commission on Immigration and Refugee Policy With Supplemental Views by Commissioners (1981)." The Commission was established by Public Law 95-412—passed on October 5, 1978—in order "'to study and evaluate . . . existing laws, policies, and procedures governing the admission of immigrants and refugees to the United States and to make such administrative and legislative recommendations to the President and to the Congress as are appropriate.'" The Commission's final report was issued on March 1, 1981.

In Kansas, judicial notice is governed by K.S.A. 60-409. It does appear that the report falls under the types of items that are subject to judicial notice in the statute. Likewise, we do not find the report to provide "generalized knowledge which are capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy." See K.S.A. 60-409(b). Significantly, we do not know whether a report published more than 30 years ago reflects the current status of federal immigration law. As a result, we decline the invitation to take judicial notice of the report.

In reaching our conclusion that the "immigration status" provisions enacted by the City of Lawrence are not currently preempted by federal law, we rely on federal statutes and federal caselaw. Should Congress or the United States Supreme Court reach a different conclusion at some point in the future, the Landlords of Lawrence—or others impacted by the "immigration status" provisions—could bring an action asserting federal preemption at that time based on a change in law. But based on the current status of federal law, we conclude that the Landlords of Lawrence has failed to establish that the "immigration status" provisions are preempted.

*"Source of Income" Provisions*

Similarly, the members of the Landlords of Lawrence contend that the "source of income" amendments to Chapter 10 of the City Code are preempted by federal law. In support of this contention, they argue that these provisions interfere with the voluntary nature of the Housing Choice Voucher program as well as other similar programs. In rejecting this argument, the district court determined that the "source of income provisions are consistent with the purposes and objectives of Congress because they are designed to prevent discrimination that would reduce the availability of decent and affordable housing."

In support of its determination, the district court cited 42 U.S.C. § 1437(a)(4), which promotes the goal of "providing decent and affordable housing for all citizens through the efforts and encouragement of Federal, State, and local governments . . . ." The district court determined that it is the federal government's policy to assist states and municipalities in reducing unsafe housing conditions as well as in finding a remedy to the shortage of "decent and safe dwellings for low-income families." 42 U.S.C. § 1437(a)(1)(A). As a result, the district court concluded that the "source of income" provisions added to Chapter 10 of the City Code are consistent with the purposes and objectives of Congress because they are designed to prevent discrimination in housing. Like the district court, we do not find that the "source of income" amendments to Chapter 10 conflict with federal law. See *Montgomery County v. Glenmont Hills Associates Privacy World*, 402 Md. 250, 269, 936 A.2d 325 (2007) ("The only declared objective is to assist State and local governments in expanding affordable housing for low-income families.").

We also do not find the plain language of Section 10-111.13 or any other section of Ordinance 9960 to require landlords to participate in the Housing Choice Voucher program or other similar federal programs. Rather, we find that the amendments—on

11

their face—simply require that landlords must "comply with the administrative requirements of" any "benefit, or subsidy program" in which they participate, and they remain free to choose not to rent to participants in such programs for other legitimate reasons. See *Bourbeau v. Jonathan Woodner Co.*, 549 F. Supp. 2d 78, 87 (D.D.C. 2008) (landlords remain free not to rent to voucher holders for other legitimate reasons, such as an applicant's rental history or criminal history or the fact that the cost of the rent of the unit surpasses the amount of the voucher).

In *Austin Apartment Association v. City of Austin*, 89 F. Supp. 3d 886, 896 (W.D. Tex. 2015), the United States District Court for the Western District of Texas found that prohibiting discrimination against voucher holders "'advance[s] rather than denigrate[s]'" the objectives of Congress to encourage decent housing. In particular, the court held that the ordinance did not stand as an obstacle to the execution of the federal Fair Housing Act by making participation in the voucher program mandatory rather than voluntary. 89 F. Supp. 3d at 894-95. Instead, it found that the city's ordinance served the same purpose as the federal law. 89 F. Supp. 3d at 895-96. The court explained that the Housing and Urban Development federal regulations "specifically provide the federal statutes creating it are not intended 'to preempt operation of State and local laws that prohibit discrimination against a [Housing Choice Voucher] holder because of status as a . . . voucher-holder.'" 89 F. Supp. 3d at 896.

We conclude that the "source of income" amendments to Chapter 10 of the City Code do not conflict with or otherwise provide an obstacle to federal law. Instead, we find these amendments to be consistent with the purposes and objectives stated by Congress to prevent discrimination in housing. We also find these amendments to be consistent with Congress' intent to increase the availability of decent and affordable housing to voucher holders. Therefore, we do not find the "source of income" provisions to be preempted by federal law.

*Constitutionality of Amendments*

The constitutionality of a municipal ordinance is a question of law subject to de novo review. See *DWAGFYS Manufacturing, Inc. v. City of Topeka*, 309 Kan. 1336, 1340, 443 P.3d 1052 (2019). When reviewing the constitutionality of an ordinance, we must:  "(1) presume the ordinance is constitutional; (2) resolve all doubts in favor of validating the ordinance; (3) uphold the ordinance if there is a reasonable way to do so; and (4) strike down the ordinance only if it clearly appears to be unconstitutional. [Citation omitted.]" *City of Lincoln Center v. Farmway Co-Op, Inc.*, 298 Kan. 540, 544, 316 P.3d 707 (2013). Thus, those challenging the constitutionality of an ordinance—in this case the Landlords of Lawrence—have a "weighty burden." 298 Kan. at 544.

*Assistance Program Provision*

The members of Landlords of Lawrence argue that Section 10-111.13 of Ordinance 9960 is unconstitutionally vague. This section provides that it is unlawful "[t]o refuse to comply with the administrative requirements of any assistance, benefit, or subsidy program, including but not limited to housing quality inspections for Housing Choice Vouchers." They also argue that this provision creates an unconstitutional delegation of the City Commission's lawmaking authority to public or private housing programs.

To determine whether an ordinance is unconstitutionally vague, we apply a two-step analysis. 298 Kan. at 545. Under the first step, we must determine whether the ordinance adequately defines the proscribed conduct and gives adequate notice to those who must follow it. In other words, the ordinance must "'convey sufficient definite warning and fair notice as to the prohibited conduct in light of common understanding and practice.'" 298 Kan. at 545 (quoting *Steffes v. City of Lawrence*, 284 Kan. 380, 389, 160 P.3d 843 [2007]). An ordinance is unconstitutionally vague—and thus violates due

13

process—if it requires or forbids an act in terms so unclear that a person of common intelligence must guess at its meaning. *City of Wichita v. Hackett*, 275 Kan. 848, 853, 69 P.3d 621 (2003). On the other hand, we are to uphold an ordinance as constitutional if it uses words that are commonly understood, have been judicially defined, or have a settled meaning in law. 275 Kan. at 853-54.

Under the second step, we must determine whether the terms of the ordinance are precise enough to adequately protect against arbitrary and discriminatory enforcement. *Steffes*, 284 Kan. at 389; see also *Hill v. Colorado*, 530 U.S. 703, 732, 120 S. Ct. 2480, 147 L. Ed. 2d 597 (2000). As the United States Supreme Court has held, this second step is the most important factor in considering whether a statute or ordinance is unconstitutionally vague. See *Kolender v. Lawson*, 461 U.S. 352, 358, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983). This is because a statute or ordinance "must 'provide explicit standards for those who apply them' or it will amount to an 'impermissibl[e] delegat[ion]' of 'basic policy matters' by the legislative branch to 'policemen, judges, and juries for resolution on an *ad hoc* and subjective basis.'" *State v. Harris*, 311 Kan. 816, 821, 467 P.3d 504 (2020).

As for the first step, we agree with the district court that Section 10-111.13 of the ordinance adequately informs "landlords that they must follow the administrative requirements of any assistance, benefit, or subsidy program that pays rent for a tenant." Again, we do not read the plain language of this amendment—on its face—to require landlords to participate in the Housing Choice Voucher program or to prohibit them from refusing to rent to voucher holders based on other legitimate reasons. But if they do rent to voucher holders, the ordinance makes it an unlawful practice "[t]o refuse to comply with the administrative requirements of" any such program in which they participate.

We pause to note that counsel for the City of Lawrence advocates for this interpretation of the assistance program and we find this interpretation to be reasonable.

14

Moreover, we expect the City Commission and its agencies to act consistent with this interpretation. In the event that the City attempts to enforce Chapter 10 of the City Code in a manner inconsistent with this interpretation, a landlord could still assert an "as applied" challenge at that time.

Moving on to the second step, we find the terms of the assistance program provision to be precise enough to adequately protect against arbitrary and discriminatory enforcement. Once again, we do not find this provision to require landlords to comply with the requirements of assistance or subsidy programs in which they do not participate nor those that do not apply to a particular property or tenant. Instead, we find that on its face Ordinance 10-111.13 merely requires that landlords comply with the requirements of those programs in which they do participate.

Although the Landlords of Lawrence points us to *Sedlack v. Dick*, 256 Kan. 779, 887 P.3d 1119 (1995), and *Gumbhir v. Kansas State Board of Pharmacy*, 228 Kan. 579, 618 P.2d 837 (1980), we find both these cases distinguishable from this case. In *Sedlack*, our Supreme Court found that it was unconstitutional to delegate legislative power to a private association. 256 Kan. at 802-03. Likewise, in *Gumbhir*, our Supreme Court found that the Legislature is prohibited from delegating legislative powers to nongovernmental associations or groups. 228 Kan. at 584-85. But in the present case, we find that Chapter 10 of the City Code contains a specific enforcement provision that falls under the responsibility of the City of Lawrence's Human Relations Division. See Section 10-108. So the enforcement of the ordinance is not left to a private or nongovernmental group. We, therefore, conclude that the assistance program is not unconstitutionally vague under either step of our analysis.

*"Source of Income" Provisions*

The Landlords of Lawrence also asserts that the "source of income" provisions in Chapter 10 of the City Code are unconstitutionally vague. In particular, it argues that the definition of "source of income"—found in Section 10-102.32—of Ordinance 9960 is so unclear as to be unconstitutional. We again apply a two-prong analysis in determining whether the challenged ordinance is unconstitutional on the grounds of vagueness. *City of Lincoln Center*, 298 Kan. at 545.

Section 10-102.32 of the ordinance defines "source of income" as:

"[A]ny source of money paid to an individual family or [on] behalf of an individual or family, including, but not limited to:

"(A) Money derived from any lawful profession, occupation, or activity;

"(B) money derived from any contract, agreement, loan, settlement, court order (such as court-ordered child support or alimony), gift, grant, bequest, annuity, or life insurance policy; and

"(C) money derived from any assistance, benefit, or subsidy program.

(1) Assistance, benefit, or subsidy programs include, but are not limited to:  Any housing assistance, such as Housing Choice Vouchers, Veterans Affairs Supportive Housing (VASH) Vouchers, tribal grants or vouchers, or any other form of housing assistance payment or credit, whether or not paid or distributed directly to a landlord or other owner of land; public assistance; emergency rental assistance; tribal or Native American benefit programs; veterans benefits; Social Security or other retirement programs; supplemental security income; or other assistance program administered by any federal, state or local agency or nonprofit entity."

The Landlords of Lawrence argues that the "source of income" definition is "extremely broad and demonstrably ambiguous" because it leaves open the question of whether a landlord may discriminate against a person whose income is derived from an unlawful source. But as the district court observed, the ordinance "does not prohibit

landlords from making common sense decisions about risk due to criminal behavior of a prospective tenant."

As the United States Supreme Court has recognized, "we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). "Because of the strong presumption in favor of the constitutional validity of legislation, statutes are not '"automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language."'" *Hearn v. City of Overland Park*, 244 Kan. 638, 641, 772 P.2d 758 (1989) (quoting *Parker v. Levy*, 417 U.S. 733, 757, 94 S. Ct. 2547, 41 L. Ed. 2d 439 [1974]). Like a statute, the goal of a municipal ordinance is to provide fair notice to those to whom it is directed. *In re A.B.*, 313 Kan. 135, 138-39, 484 P.3d 226 (2021).

Here, the definition of "source of income" expressly includes money "from any *lawful* profession, occupation, or activity." (Emphasis added.) Even though it does not expressly exclude money derived from an *unlawful* source, we find that it is implied by use of the term "lawful" as part of the definition. Under the maxim *expression unius est exclusio alterius*—the inclusion of one thing implies the exclusion of another—we may presume that a legislative body intended to exclude an item from a list if it did not include it in the list. *Bruce v. Kelly*, 316 Kan. 218, 233, 514 P.3d 1007 (2022); see also *Patterson v. Cowley County, Kansas*, 307 Kan. 616, 626, 413 P.3d 432 (2018). Applying the maxim to the definition of "source of income" set forth in the ordinance, we presume that the City intended to exclude money obtained from *unlawful* professions, occupations, or activities from the list of income sources that cannot be considered by a landlord in making rental decisions.

We agree with the Landlords of Lawrence that Section 10-102.32 would have been clearer if it had not included the "catchall" language in the definition of "source of income." Nevertheless, we find that the word "lawful" being placed in front of "profession, occupation, or activity" is sufficient to reflect that money derived from unlawful professions, occupations, or activities is excluded from the types of income sources that cannot be considered by a landlord in making rental decisions. As a result, we do not find Section 10-102.32 of Ordinance 9960 to be unconstitutionally vague on its face.

*Standing on Fourth Amendment Claim*

The final contention asserted by the members of the Landlords of Lawrence is that the district court erred in determining that it lacked standing to challenge the amendments to Chapter 10 of the City Code as being violative of its right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution. Parties to a judicial action must have standing as part of the Kansas case-or-controversy requirement imposed by the judicial power clause of Article 3, section 1 of the Kansas Constitution. See *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 895-96, 179 P.3d 366 (2008). The standing inquiry asks whether a party has a sufficient stake in the controversy to warrant invocation of jurisdiction and to justify the exercise of the court's remedial powers on that party's behalf. *Board of Johnson County Comm'rs v. Jordan*, 303 Kan. 844, 854, 370 P.3d 1170 (2016).

Whether a party has standing in a judicial action likewise presents a question of law over which this court's scope of review is unlimited. *In re Care & Treatment of Emerson*, 306 Kan. 30, 34, 392 P.3d 82 (2017). "The determination of jurisdiction and standing rests on the facts in existence at the time of filing." *In re Estate of Mouchague*, 56 Kan. App. 2d 983, 987, 442 P.3d 125 (2019) (citing *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 580, 124 S. Ct. 1920, 158 L. Ed. 2d 866 [2004]). When a

party raises an issue of standing, the party asserting the claim has the burden of establishing its standing in the case. *KNEA v. State*, 305 Kan. 739, 746, 387 P.3d 795 (2017). If standing is not shown, "'there is no justiciable case or controversy' and the suit must be dismissed. [Citation omitted.]" *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 750, 189 P.3d 494 (2008).

Under the traditional test for standing, one must demonstrate "'that he or she suffered a cognizable injury and that there is a causal connection between the injury and the challenged conduct.' [Citation omitted.]" *Gannon v. State*, 298 Kan. 1107, 1123, 319 P.3d 1196 (2014). Here, the Landlords of Lawrence is making a pre-enforcement Fourth Amendment challenge to the amendments to Chapter 10 of the City Code. As our Supreme Court has stated, "[a] high threshold is required to demonstrate standing on a pre-enforcement challenge. The challenger must show an imminent threat of prosecution that is not speculative or imaginary." *League of Women Voters of Kansas v. Schwab*, 317 Kan. 805, 813-14, 539 P.3d 1022 (2023).

In *Jones v. Wildgen*, 450 F. Supp. 2d 1265, 1266 (D. Kan. 2006), a tenant argued a city's housing ordinance violated his Fourth Amendment rights to be free from unreasonable searches because it required rental properties to be licensed and inspected. Although the tenant's home had not been searched, he argued that there was a potential for such a search in violation of his Fourth Amendment rights because "the City at any time could choose to search his present residence." 450 F. Supp. 2d at 1271. The United States District Court for the District of Kansas found that the tenant lacked standing because the "mere possibility of a future controversy is not enough to defeat summary judgment." 450 F. Supp. 2d at 1271.

The Landlords of Lawrence points us to *Robinson v. Kansas State High School Activities Ass'n*, 260 Kan. 136, 140, 917 P.2d 836 (1996), and *KNEA*, 305 Kan. at 747-48, in support of its argument. But in both cases, the plaintiffs demonstrated an imminent loss

19

of rights—not simply a mere possibility of a future controversy—as a result of the challenged law. Here, based on our review of the record on appeal, we do not find that the Landlords of Lawrence has demonstrated an imminent loss based on a violation of the landlords' Fourth Amendment rights.

We find that the Fourth Amendment challenge asserted by the Landlords of Lawrence hinges on a possibility that the landlords' property or records may be subject to inspections by government agencies. But at this point in time, they have not yet been subjected to such searches. Because the Landlords of Lawrence has not established an imminent threat of injury, we find that it lacks standing currently to challenge the amendments to Chapter 10 of the City Code on this basis. Even so, should unlawful searches be attempted or conducted in the future, the affected landlords can assert their rights under the Fourth Amendment at the appropriate time.

CONCLUSION

In conclusion, we find that State and local governments have a legitimate interest in protecting the affordability and quality of housing. See *Austin Apartment Association*, 89 F. Supp. 3d at 895-96. In light of the strong presumption in favor of constitutionality, we do not find the amendments to Chapter 10 of the City Code to be unconstitutional on their face. We also find that the amendments are not preempted based on the current status of federal law. In addition, we find that the Landlords of Lawrence lacks standing to challenge the amendments at this point in time as violative of the Fourth Amendment.

At the same time, we recognize that there is a possibility that federal law on the subject of immigration may change in the future. If so, it may be necessary to revisit the issue of federal preemption. Likewise, we recognize the possibility that the amendments to Chapter 10 of the City Code could possibly be applied in an unconstitutional manner

as the Landlords of Lawrence contend. As such, it is incumbent upon the City of Lawrence to ensure that Chapter 10 of the City Code is constitutionally applied.

Affirmed.